May I please record? Just let everybody get organized. May I please record? My name is Sonny McIntyre. I represent Cushman & Wakefield, the appellant, along with Mr. Ralph Lepore with the Holland & Knight firm. With the court's permission, I would request an opportunity for a three-minute rebuttal. That's fine. Thank you. There are four issues that I'd like to address today that, when resolved, will require a reversal of the trial court verdict in the judgment. The first is that the district court failed to properly apply the Erie Doctrine in several material respects. First, the court failed to recognize and apply the New York decision in the Hoffman case. That's a decision from the highest court in New York, the Court of Appeals in New York, that was handed down in 2010 that has jurisdiction-stripping effects on the verdict in this case based upon the fact that the New York law, the New York City human rights law, requires an impact test, and the facts of this case has failed the impact test. Yes, Your Honor. Counsel, the term jurisdiction is a term that's malleable and subject to misinterpretation. It is true. I've read the New York decision, and it is true that a New York court would have lacked subject matter jurisdiction if there were no impact under the New York City ordinance. But there is no question but that the federal district court here had subject matter jurisdiction over this action. That action was, that subject matter jurisdiction was based on diversity of citizenship, and the requisites of that were present. So the real issue in this case, on this point, is not an issue of subject matter jurisdiction. It's an issue of justiciability, whether the statute under which the plaintiff has brought this particular claim is a statute that is available to him against the defendant. It would have been helpful had that issue been seasonably raised by the defendant, which it was not. But passing questions of waiver or forfeiture, why aren't the district court's findings in the post-trial motion on the question of impact dispositive of this issue? First, we will acknowledge that the trial court below had diversity of jurisdiction, Article III jurisdiction, subject matter jurisdiction. However, the Penske case, which is cited in the briefing, which is the Tenth Circuit case, is very informative on this issue. Basically, it stands for the proposition where you have a jurisdiction-stripping state law, which is required to be followed by a court sitting in diversity. It effectively requires the court to decline to exercise subject matter jurisdiction. So it's a declination. It's a refusal to exercise the subject matter jurisdiction that the court already had. To quote the Tenth Circuit, when a state court closes its doors, the federal court cannot reopen those doors, and therefore there cannot be an issue of waiver here. There are certain affirmative defenses as to standing... That last part came from the Tenth Circuit, therefore there cannot be a waiver here? The court actually addressed in that case the issue of affirmative defenses, which can be waived, and discussed its previous holding in the Storer case that discussed the subject matter issue, indicating that there are certain situations that cannot be waived. But the statement, therefore there can be no waiver here, was not part of the Tenth Circuit opinion? It was a dicta. It was not actually part of the holding. That was actually remanded back to the court for further evidence in connection with further 26 pending proceedings. Skipping past waiver and forfeiture for a moment, just to just tell you this question, which is you can only win ultimately if the New York Human Rights Ordinance does not cover a situation like this, because the impact test isn't met, right? That is correct. Okay, so the district court happened, waiver or no, to make findings that the impact test was satisfied. Well, and with due respect to the court below, the court was wrong. So why is that? Because it's undisputed that Mr. Renske, the appellee, had moved to Massachusetts, was working in Massachusetts. Was he an employee of the New York office while he was in Massachusetts? He was reporting to supervisors in New York, and to that extent he was an employee of the office in New York. The position of Cushman and Wakefield was that he had been an employee of the New York office all along and had never been authorized to transfer to any other office. That's indeed the reason that he was fired. That is not to just, well, setting aside the issue of the reason why he was terminated, the dispositive issue is not whether he was an employee. The dispositive issue is where he's physically located, and that's what the Hoffman test addresses. Just to get it straight, New York City has no interest in stopping the filing process. A person who is an employee of the New York office is misled into moving to Massachusetts, is fired in consequence of being tricked into moving to Massachusetts when the real reason was age discrimination. I'm not saying this is what happened. I'm just saying to understand the impact test. Your view is New York City has no interest in stopping that? Well, I'm going to suggest that, first of all, that's not factually what did happen. New York City is not going to extend the scope of the jurisdiction under the city code to individuals who reside and work in another state. Even when the New York office that still employs them tricked them into moving there? Well, first of all, that didn't happen. I understand that, but I'm trying to figure out what the scope of the New York statute is. Well, the scope is you have to be physically located within the five borders. I would suggest that New York City has no interest in stopping a New York office from tricking one of its employees to move to Massachusetts, because once they're in Massachusetts and they're not physically located in New York, they can be fired. What you're referring to is actually the Russellburg case. Are you saying, yes, that's how the New York City ordinance operates? The New York City operates in the following fashion. It requires the actual physical presence within the five boroughs of New York City. If the individual is a non-resident of the state of New York and does not live in New York City, that person has to be working within the five boroughs of New York City, and that's precisely what the Hoffman case said, because the individual was living in Atlanta, Georgia. What counts as working? Working? Doing the daily tasks. For who? For the New York office? For the New York office. Your Honor, that's exactly what happened. Because the evidence here showed that he was doing the daily tasks for the New York office. He was. Right. So isn't that a problem? No, sir, it's not. Because that's what the Hoffman case stands for. The Hoffman case stands for the proposition that the individual in Atlanta, Georgia, reporting to his supervisors and management team in New York, did not have the right to bring a case under the city code. That's what the Hoffman case is all about. The Russellburg case discusses a brief detour from that whole thing. Again, it's a Second Circuit case, not a New York State case, that talked about trying to induce the employee to leave the city to create an opportunity to terminate. The Russellburg case appears to be findings of the magistrate judge that were reported to district court. That's correct. Were they adopted by the district court? It's my understanding that they were. And it presents really the scenario that Judge Barron suggests. It does, but it's an opposite to our case. Because, first of all, Mr. Rinsky had made the decision to move to Massachusetts, had actually physically moved to Massachusetts, had bought a home in Massachusetts, sold his home in New Jersey. All of which he had done, taking the evidence most favorable to him, because he had been misled by the company into thinking that that was all acceptable to the company. Well, with all due deference to the court. Well, that's what his testimony is. And that's apparently what the jury believed because they found for him. The focus is, where was Mr. Rinsky physically located? Where was he working at the time of the adverse employment action? Do you have an idea of how underhanded or nefarious the employer's conduct is? I'm sorry, sir, I couldn't hear that. I said, you want us to focus on the physical whereabouts of the plaintiff. Yes, sir. And ignore the nature of the conduct of the employer, which, to use Judge Barron's word, may have tricked the employee into believing that what he was doing was perfectly acceptable to the employer. Accepting your hypothetical for a moment, yes, I am. And this is the reason why. Because the Russellburg Court case actually acknowledged that this was a gray area and that the New York Court of Appeals of New York had specifically said, we don't want to create a gray area. We want to have a very simple test. We reject. We reject the location decision test where the decision is made for the adverse employment action. We reject that because it could be abused and manipulated. There are too many gray areas. The courts have also said that in considering impact, we have to consider the impact, too, on the other employees of the company. The Hoffman case makes it very clear that we have to look for a nonresident. We have to look where the nonresident is physically located at the time of the adverse effects. Otherwise, you will have a myriad of situations. Otherwise, the Hoffman case wouldn't even exist today. Was there any allegation of trickery? No, sir. No. So then you would have the Hoffman case. You would just distinguish it by saying it's different when there was trickery. This is not a trickery case. There's no trickery. Okay, but then on that question, if you want to make the argument that there is not sufficient evidence to find trickery, I totally understand the argument. It's just a different argument than you're making, which is even if there is sufficient evidence of trickery, you win. I believe you correctly stated that. Okay. Do you want to address why there's not sufficient evidence of trickery? The decision to terminate was made by Mr. Couillard, who was the head of the group. He didn't even weigh in on the decision and wasn't even aware of the issue that Mr. Ritsky had moved to Massachusetts until the first week of June of 2015. Mr. Ritsky had already declared his homestead declaration for Massachusetts, had already bought and moved into physically, moved into his home in Winchester, Massachusetts. He had done all of that because he had been told by his superiors in the company that his transfer had been approved and that he had gone through appropriate channels. He was then fired because the company said, oh, no, there's a different procedure, one which we didn't tell you about, and unless you're prepared to stop, to come back to New York and work five days a week in the New York office, we want you to resign. And when he didn't resign, they fired him. Now, why isn't that trickery? If his tale is believed, I understand you've got a different set of facts about whether he was misled or not, but the jury credited his, as did the trial judge, which is evident from her decision on the motion for judgment as a matter of law. Well, I would respond to your question in the following respects, in the following manner. The termination decision was made on June 22nd, June 23rd of 2015, roughly a month after Mr. Rinsky had already moved to Massachusetts. I'll reserve the rest of my time. You can finish that answer. This is roughly 30 days after Mr. Rinsky had already moved to his domicile to the state of Massachusetts and had begun working, and that falls strictly within the crosshairs of Hoffman. Thank you. Good morning, Your Honors. Mark Zoll representing Uri Rinsky, the appellee. With the court's indulgence, I'd like to reserve the last three minutes of argument for my co-counsel. You can't. You can't. I cannot? No. Okay. Thank you, Your Honor. I'd first like to… It's the advantage of answering the appellate. I'm sorry? You have the advantage of answering the appellate, so you can't repeat the question. Your Honor, he wasn't asking me to reserve my time for argument. Oh, I misunderstood you. Your co-counsel is going to do… The last three minutes, Your Honor. Sorry, I wasn't clear on that. I'd first like to just tackle the estoppel article. My brother's position, even though it's incorrect, is that the place of residence of Mr. Rinsky controls the jurisdictional and choice of law analysis. There's no dispute that he was physically living in Massachusetts at the time he was notified of his termination. We filed initially in Middlesex Superior Court under Massachusetts law. On the eve of trial, the appellant moved to the court to apply New York law because he was an employee of New York City for 27 years, and they argued successfully to the trial court that New York City had the most interest in the case, given that he'd worked there for 27 years. I thought that the defendant had argued for the application of the New York State anti-discrimination law, not the New York City law. Well, they argue that the New York State law should apply in lieu of… Not just in the interest of accuracy, all right? The city law was more favorable to the plaintiff and was applied, as I understand the record, over the defendant's objection. The initial request, my understanding, was to apply the law of the jurisdiction, not a particular law. In other words, the argument wasn't we'd like New York State law to apply, but if New York State law doesn't apply and New York City law applies, then we'll take the Massachusetts law instead. It was the law of the jurisdiction as opposed to a specific statute. But because the choice of law point related to New York State law, there's no inconsistency between their position that the New York City law has an impact test that's not satisfied and that New York State had an interest in this case superior to Massachusetts. But the New York City law applies to employers and employees that work within the five boroughs of New York City. No, I understand that. I'm just saying there's no inconsistency between the positions they took on the choice of law issue and the position they're taking with respect to the scope of the New York City law. Well, I would respectfully disagree on that point. You're arguing for the application of judicial assemble. What Judge Barron is questioning correctly, in my view, is that there are certain particular requirements before that doctrine can be applied, one of which is that a party take completely inconsistent positions. And I don't see that in this case. I'm not unsympathetic to your argument that the New York City law was the proper law to apply. I just think judicial assemble is a reach. Based on the arguments on choice of law, but based factually, Your Honor, as well, they took the position throughout trial that Mr. Rinsky was always an employee of the New York City office. He was never permitted to transfer, and he was fired for job abandonment for not returning. Which is inconsistent with the fact that he was living in Massachusetts at the time of the firing, which you've just admitted, and which they say, perhaps incorrectly, but which they say is the dispositive consideration. Yeah, and Your Honor, I think if you look at the Robles case from the Eastern District of New York, it expressly says that a plaintiff's resident is irrelevant in the analysis. You know, my brother talked a little bit about the Hoffman and the Wechselberg case. You know, I would submit the Wechselberg case is much more on point. In that case, the plaintiff had worked for a New York City company for six weeks and then worked remotely for five weeks. During those five weeks, the plaintiff was working remotely for the New York City office, and they held that there was an adequate showing impact under the New York City human rights law. Here, you have an employee who was working for the New York City office for 27 years, moves to Boston, is working remotely for the New York City office for one month, and, you know, the impact analysis is much, much stronger in this case than it was in the Wechselberg case. Now, you seem to be making almost the symmetrically categorical argument on the other side, which is that it doesn't matter if there was trickery because he worked in the New York office for so long. Well, in this case, the conduct actually occurred in New York City, too, which makes the argument that much stronger. The evidence showed that the plan to terminate Mr. Rinsky was actually formulated and discussed in New York City before he had even left. But, again, you're not emphasizing trickery, which I'm just puzzled by. In Hoffman, where was the location of the decision to fire him? The location was made in New York City. And there wasn't enough there. I'm sorry? There wasn't enough in Hoffman to make an impact, right? Yeah, Hoffman is so factually dissimilar to this case. So what I'm trying to figure out, you seem to be emphasizing everything but what would seem to me the strongest point for you, which would be the trickery that led him to be out of state. Well, I mean, that's essentially, you know, he was led down the primrose path, thinking that he was allowed to transfer, and as soon as he gets to Massachusetts, the rug has been pulled out after the planning has gone behind the scenes in New York while he was already there. I mean, the essential, you know, argument here is that, you know, he was given approval by his direct supervisor to transfer, as well as the supervisor above him. He was never told that there was any other approvals or process necessary. He told his supervisor when he was planning to move to Boston, and his supervisor responded, okay, let's discuss. They had a discussion about how things would work going forward. At the same time, behind the scenes, the colleagues are getting together to discuss how to terminate him once he leaves. Was his position in New York formally ever ended? Is there anything in the record that tells us one way or the other about that? Like such as, you know, you're no longer a New York City employee or nothing. Exactly. Is there like a payroll that is in the record that shows he's now on the Massachusetts office payroll rather than the New York office payroll or anything like that? Not in the record, and that's for the reason that the position of the defendant at trial was always that he was always a New York City employee. He was never a Massachusetts employee. So during the period of time when he was physically in Massachusetts, he continued to receive his pay from New York and his benefits, et cetera. Correct. I mean, it's important to note as well that during his, you know, 27 years of employment at Cushman & Wakefield, the last few years of it, he was working remotely three or four days a week. He lived in New Jersey, and due to a space issue at Cushman & Wakefield, he was working from home for the New York City office three to four days a week. Goes to Massachusetts and then all of a sudden is told, you have to be in the New York City office tomorrow and every day five days a week, notwithstanding the fact that you've worked the majority of your time remotely throughout your employment. But I thought your position was he understood himself to have been leaving the New York office and joining a new office in Massachusetts. Is that right? He was going to have office space in Cushman & Wakefield location in Massachusetts. His job and his roles and responsibilities were going to continue to be the same. His supervisors, his tasks. Was it like a farewell party or something like that? Well, essentially, I mean, on his last day there, he made the rounds and said, you know, goodbye to everybody and, you know, his supervisors and everybody. But the idea was then goodbye, but I'll call you Monday? Essentially. Working like we were working before?  It was business as usual. You know, these, you know, involved phone calls, e-mails, work on this computer system that was being phased out, the AS400 system. So, you know, and again, he had been working remotely three or four days a week, so nothing really changed except the locus of where he was performing his work. So his duties would not have changed? Correct. The identity of his supervisor would not have changed? It did not. And your argument was that this was part of also a plan whereby he would be kept on for a short period, transfer his knowledge to somebody who had been lined up to replace him? Yes. A younger person? A substantially younger person, 48 years old. Mr. Rinske was 63 at the time. Was contacted by Mr. Rinske's supervisor, again, before Mr. Rinske ever left New York City. Said there would be an opportunity coming up. He was eventually hired. There's an e-mail that's in the addendum to our brief that shows the plan that was put in place. Hire the younger contractor, transfer knowledge from Mr. Rinske to that younger employee, keep Mr. Rinske on for a short period of time to cover important work, and then terminate him. Mitigating litigation risks is what it said in the e-mail. Can I ask you about the punitive damages point? Correct. Yes, sir. So to establish punitive damages, you have to show that C&W acted willfully, wantonly, or recklessly. And in the jury verdict form regarding age discrimination, the jury was told that they needed to determine whether age was a substantial factor. Now, the evidence here arguably shows that C&W was concerned about the challenges resulting from somebody who's working remotely, you know, a number of 250 miles away. And so is that decision a willful, wanton, and reckless decision, justifying punitive damages? I believe the record reflected that specifically for the fact that the planning and scheming for terminating Mr. Rinske occurred while he was still in the building. They had every opportunity to say, you know, no, you've misunderstood. You don't have authority to transfer. No, if you move to Massachusetts, you're risking your job. And, you know, there wasn't a fair way. That goes to liability. I mean, in terms of punitive damages, what is the best case? And I realize that every case differs on its facts. What's your home run case? Well, I think Attorney Kennedy can speak better to punitive damages in terms of the single case, but I think the jury was more than warranted in issuing punitive damages in this case based on the fact that there was, you know, clear evidence that there was machinations going on behind the scenes that could have been avoided. You know, as he's saying his goodbyes on his last day, somebody could have said, you know, where are you going? What are you talking about? You're going to Boston. And they let him go just so they could engineer this. I just want to pick up one thread from a question Judge Katzman asked you. I'm just not fully following what happened here. He left thinking the New York job was over or left thinking the New York job was not over? He left thinking that his job was authorized to be performed from his residence in Massachusetts. And that he was going to be replaced or not? No, that nothing would change other than he would perform his work from Massachusetts as opposed to performing it from New Jersey. He was unaware that his information was going to be transferred to this other person? He was unaware. That was an internal email behind the scenes with management that he was not aware of. Thank you. Music Court, Your Honor. I'm John Denny here, representing the plaintiff. And I just wanted to hit home on a couple of points. I do believe the court is on point when it's speaking to this idea of trickery. There's a memo that was hatched before Mr. Rinsky left New York City. And it was about stringing him along and getting him to take the step to telecommute from Boston and use that as a basis to terminate him. The reason why they wanted to do that is he's an aging employee. He's only working on the AS-400. That's his knowledge base. And they wanted to phase out the AS-400. His replacement, I think the court picked up, was going to be based and was based in New York City. So it distinguishes Hoffman right there. I think the other point about this, when we get back to judicial estoppel, is that by seeking New York law under conflicts of law scenario, the defendant in the case basically made a tacit admission that there's some impacts in New York. Mr. Rinsky never worked in Albany. That's not necessarily so, because the New York State Anti-Discrimination Law does not require any finding of impact. But by seeking New York law to apply, you're saying there's some nexus. You're saying there's some connection with New York. That's different than saying there's an impact. A connection may result from a variety of things. They particularly point, Your Honor, though, that there was more of a connection to New York than there was to Massachusetts. They're not synonymous. I agree, but I think that the way they went about it was that they said that there's more of a connection, more of an impact in New York. No, no, no. See, you're conflating the terms. If they had said more of an impact, maybe there would be a case for judicial assault. But they didn't. They said more of a connection. I still think it speaks to the argument of whether impacts met. You have a defendant that makes a tacit admission that there's a nexus to New York. He only worked in New York City. What were the facts they relied on to establish the nexus for choice of law purposes? Because at that time, they're saying he only worked in New York. That was their position. Right. So, I mean, if he only worked in New York, that's the connection. The judge, when she stepped in this case, her first comment to us was, this case seems like it's more related to New York than Massachusetts, and we should do what conflicts the law. Even now, they're not denying that he only worked in New York. They're just saying that for purposes of the New York City law, the fact that he was residing in Massachusetts, as presumably you argued he was when you resisted the choice of law. We didn't resist the choice of law. The minute they asked for it, I asked the court to give us time to take it under consideration. They filed their brief. We reviewed their brief, and we said they're right, but the New York City statute would apply. Thank you. Thank you. Thank you. The Hoffman case was structured in a way to prevent and foreclose what's happening here, and that is a minimum contacts analysis. The New York, the Court of Appeals in New York made it very clear we want a simple test. The simple test is, where is the discrimination victim? Where is he living? Where is he residing? If he's residing outside the five boroughs of New York City, then where was he working? He was working and residing and living and breathing in Massachusetts. It is squarely within crosshairs of the New York case, and it requires that the district court decline to exercise subject matter jurisdiction. Unlike in Hoffman, the plaintiff here spent 27 years in New York and arguably only went to Massachusetts with the understanding that he still had a job with the company. I think that's irrelevant. As harsh as it may seem, I think that is irrelevant. The fairness here, it is a harsh result, but it's a fair result because there has to be certainty for the application of New York law. What the appellee is suggesting is ambiguity in how that law is going to be applied. The New York court wanted to make it very clear how the application would be handled, and it is a bright line test. Where is he working? Where is she working? And that is what Hoffman stands for. I'd like to briefly discuss... Just so I follow, New York City is of the view, in your view, that when it's time to replace the older person with the younger person, suggesting he ought to move to a sunnier clime to continue doing his work is a perfectly fine strategy? I don't think that's the City of New York. I think that's the Court of Appeals of New York. Interpreting what the City meant when it passed the ordinance. So it would only make sense to do that if the City Council actually was of the view that when it's time to replace the old guy with the young guy, the thing to do is to tell the old guy to continue his duties from a different state. Those facts were not before the Court of Appeals in the case we're referring to. That's exactly why Hoffman doesn't control this case. Well, Your Honor, I do believe Hoffman does because I don't think there's any jury finding here of trickery. It doesn't have to be a jury finding. Impact is not a jury issue under the New York City ordinance. The decision to terminate was made after he had already moved. You asked a question about punitive damage. After he had already been tricked into moving? He was not tricked into moving. He had already moved, Your Honor. He had physically moved to his location and made his domicile declaration in December of 2014. And I would like to briefly address the punitive damages issue. The Court failed to instruct on a clear and convincing standard. And the common law of New York requires a clear and convincing standard. The Court below confused the state of mind elements to support a punitive damage award. Can you cite in your brief a single discrimination case where a New York court applies the clear and convincing standard to punitive damages? May I respond? Yes. There are no specific cases. What we have is a common law, but the statute itself is silent. The city code is silent with regard to the burden of proof. Was there a correction? I'm sorry, Your Honor? Did you object at trial? Yes, we did. We actually proposed a clear and convincing standard to give it to the trial court, and the court refused, believing that the elements of Psy Enter, the malice, was the appropriate standard of proof, not recognizing that a burden of proof is apples and oranges. The burden of proof is distinctly different. Thank you.